## THE EMPIRE STATE.

### THE E. M. DORAN.

(District Court, E. D. New York. November 12, 1920.)

1. **Collision ⚷⟿70—Dredge need move out of channel only after reasonable notice.**

    While a dredge working in a channel under a government contract cannot obstinately or unreasonably block the channel, it is obliged to move out of the channel to give room to passing vessels only after reasonable notice to do so.

2. **Collision ⚷⟿71(2)—Tug held at fault for collision between tow and dredge.**

    A tug *held* at fault for a collision between a barge in its tow and a dredge at work in the Kills, where the dredge moved only so as to increase the width of water for the tug, and the tug gave no notice for the dredge to move farther.

3. **Collision ⚷⟿136—Dredge cannot recover for time lost in getting back into position.**

    A dredge only slightly injured, while engaged in government work on a channel, by a collision due to the fault of the tug in charge of the other vessel, cannot recover for the trouble and time necessary to get back into working position after moving out of the channel, but is restricted to the actual time lost in repairing the injuries which were received.

In Admiralty. Separate libels by E. Brown Baker, as owner of the dredge Empire State, against John Barton Payne, as Agent, and by Edward O'Neill and another, as owners of the canal boat E. M. Doran, against John Barton Payne, as agent, with E. Brown Baker, as claimant of the Empire State, impleaded. Decree rendered for libelants.

Foley & Martin, of New York City (J. A. Martin, of New York City, of counsel), for libelants O'Neill.

John C. Wait, of New York City, for libelant Baker.

Charles M. Sheafe, Jr., of New York City (E. R. Brumley, of New York City, of counsel), for John Barton Payne, Agent.

CHATFIELD, District Judge. The tug Mahanoy was towing certain barges and canal boats up through the Kills on the early evening of August 25, 1919. The dredge Empire State was excavating a channel under government contract from a line between Tufts Point, N. J., and Rossville, Staten Island, to a point some miles to the northward. There is no apparent doubt from the evidence that the next to

⚷⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the last tier, having the barge Bully on the starboard side, came in contact with the dredge; that the Doran, the starboard boat in the last tier, also came in contact with the dredge; and the testimony shows plainly that some injury was received by the Doran.

It appears from the testimony that the dredge was excavating on the east side of the channel to be dredged under the contract. This would place her some 400 feet from the New Jersey bank, and some 600 feet from the Staten Island bank. She was lying generally north and south, the tide was running flood, and the dredge was kept from swinging by two cables, one to New Jersey and one to Staten Island, but both of which were allowed to rest upon the bottom, except when some strain was necessary to be exerted by the winch on one line or the other, so as to hold the dredge against the tide.

On the night of August 25th the weight of these cables appears to have been sufficient to keep the bow of the dredge from swinging. The stern of the dredge was held in place by a single spud.

Two actions have been brought: One by the owners of the Doran against the tug Mahanoy, which was towing the boats at the time, and which has in turn brought the dredge in by petition under the rule; the second action is brought by the dredge for the small amount of injury resulting to its pipe line, through which the mud excavated was being carried to the Staten Island shore for dumping, and for the amount of time lost because of the collision. While the amount of damage to the dredge is small, the question of responsibility is not to be measured thereby, and the matter of damage will be left for a reference, if necessary.

In the first action the Doran is shown to have been a canal boat of ordinary size. It appears that she had been placed with 3 other canal boats and a small barge in the last tier of this tow as the safest place for these small boats, and because the 5 boats were no wider than the boats in the tier ahead. It is alleged by the witnesses from the dredge that the tow contained six tiers of boats, of 4 each; but the testimony showing that there were but 14 boats in the tow, with 3 large barges in each of the first three tiers, is too definite to be overlooked.

Assuming, therefore, that the Doran was in the position described, the responsibility primarily for towing her safely through the Kills rested upon the tug. There is no fault shown against the canal boat in any way. The libelant O'Neill, therefore, is entitled to a decree for the damages sustained by his boat primarily against the Mahanoy, unless consideration of the issue raised in the other case should make it necessary to hold the dredge either entirely or in part for the results of the collision.

Considering, therefore, the question as between the Mahanoy and the dredge, there seems to be little issue of fact. The captain of the Mahanoy testifies that he did not blow a passing signal, but when he was within such distance that he could appreciate the situation, which, according to his testimony, was apparently some 1,000 or 1,200 feet away, he directed his tow toward the Jersey shore, so as to pass the dredge, which had been in sight for over half a mile. When several hundred feet from the dredge, he states that he blew an alarm, be-

cause at that time the dredge appeared to move towards New Jersey, and thus to further block the channel through which he expected to pass.

The testimony on behalf of the dredge shows that the captain of the dredge observed the Mahanoy when she was at least the same distance down the Kills as that from which the captain of the Mahanoy observed the dredge. Neither of them seems to have considered that whistle signals were necessary, unless there might be something in the size of the tow or its makeup which might cause danger, and which was not observable to the captain of the dredge. On the facts of the case there appears to have been no need of a whistle signal, as both parties were observing each other and acting accordingly.

The Empire State, however, knowing that it was occupying the channel, so that none too much room was given on the Jersey side through which the signals displayed indicated that the tow would have to pass, did endeavor, through taking in its port cable, to work toward Staten Island. The limit of this swing would be measured by the arc of the dredge rotating on the spud as a pivot, and the dredge, after moving toward Staten Island as far as it could, raised the spud and the tide swung the stern toward Staten Island. This maneuver apparently was what the captain of the Mahanoy saw when the bow of the dredge appeared to move toward New Jersey.

It is apparent, looking at the chart, that the captain of the Mahanoy, rounding the turn and seeing the dredge apparently rotating, with the bow of the dredge moving toward his port side, undoubtedly thought that the bow of the dredge was swinging towards New Jersey, and explains his testimony in that regard.

The fact remains that the amount of water available for the Mahanoy was increased rather than diminished, and there is nothing in the case to show that the dredge did move, so as to interfere with the Mahanoy's progress. I must therefore consider the case directly from the standpoint of responsibility for undertaking the passage or for creation of the situation as the Mahanoy undertook the passage.

[1] It appears from the rules, which are adopted according to statute, that the dredge is not allowed to obstinately or unreasonably block a channel of this nature. It has been held in numerous cases against the Berne and other Jersey Central and Lehigh Valley boats that the tugs cannot, without stopping and giving proper notice, expect the dredge to navigate out of the way of a large tow in time to let the tug pass through without delay. The regulations are in exact accordance with the situation that develops, and provide that upon proper notice, or reasonable notice, the dredge cannot obstinately refuse to move; but, aside from this provision, the statutes of the United States make it possible for the War Department to completely close the channel, if necessary, to do the excavating, and there is no legal obligation on the dredge to get out of the way on the giving of a whistle signal, in the sense in which a boat navigating up or down the channel would immediately obey that signal. The obligation, on the contrary, is on the captain of the tugboat to so manage or navigate his tow as to make the passage safely if he attempts it, and taking into account only the rights

which he and other persons using the channel can rely upon, namely, that the dredge shall not change its position, so as to interfere with the movements of the tug and its tow. Custom apparently has modified the rule to a certain extent; that is, that the dredges, in order to avoid injury to themselves, and out of a reasonable interpretation of the regulations, have been and are in the habit of giving the tows as much room as is possible; but I see from that no legal right on the part of the tow to expect that the dredge will always give way sufficiently to let the tow by.

In the case of the Mahanoy the responsibility is increased by the fact that the tow was a small one and that the boats were in but four tiers.

[2] The testimony shows that in coming around this point the swing of the tide would carry the tail of the tow toward Staten Island, and the tows do not move rapidly enough, even with the tide, to prevent the swing. In fact, the captain of the Mahanoy testified that, in order to swing his tow in this tide, he had to drop the starboard towing hawser at the time when he saw that the boats were going to come in contact with the dredge and when he attempted to swing them under a strong starboard helm.

On these facts I see no reason why the Mahanoy should not be held responsible for the unsuccessful attempt to pass the dredge in the position in which the dredge was lying at the time, and I see nothing in the action of the dredge which made the situation of the Mahanoy any worse, or which would indicate negligence on the part of the dredge at the time.

The decree, therefore, for O'Neill, should be against the Mahanoy, and the petition of the Mahanoy against the dredge dismissed, without costs.

[3] The libelant Baker should have judgment against the Mahanoy for the actual damage that he suffered, even though that is slight in value, and the question as to whether demurrage can be made to include the ordinary or usual delay in restoring the dredge to its position must be carefully considered. The libelant will not be given a decree in this case, as in a test case, for the trouble to which the dredges may be put and the time which may elapse in getting back into working order after moving out of the channel; but the damages will be restricted to the actual time lost in repairing the injuries which were received.